1
2
3
4
5
6
7

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAUL B. VARGAS,<br><br>Petitioner,<br><br>v.<br><br>SCOTT FRAUENHEIM, Warden, et al.,<br><br>Respondents. | Case No.:  20cv0516 LAB (JLB)<br><br>**ORDER:**<br><br>**(1) DENYING PETITION FOR WRIT OF HABEAS CORPUS AND**<br><br>**(2) DENYING CERTIFICATE OF APPEALABILITY** |

  Raul B. Vargas ("Petitioner") is a state prisoner proceeding pro se with a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.  (ECF No. 1.)  Petitioner challenges his San Diego County Superior Court conviction for second degree murder with the additional finding that he personally used a deadly weapon, a knife, true findings on two prior strike allegations and resultant sentence of 46 years to life.  (Id. at 1-2; see also Clerk's Tr. ["CT"] at 672-76, 696-97 [ECF No. 7, Lodgment Nos. 1-3].)

  Petitioner claims his federal constitutional rights to due process and a fair trial were violated because (1) the trial court committed prejudicial error in instructing the jury with an incorrectly modified version of CALCRIM No. 252, (2) the jury instructions provided in CALCRIM Nos. 570 and 571 were defective due to the omission of the requisite mental state for voluntary manslaughter, (3) CALCRIM No. 3472 was incorrect and unable to be

understood by the jury by reference to the other provided instructions, and (4) the consideration of Petitioner's prior juvenile adjudications in sentencing, which also violated equal protection and resulted in cruel and unusual punishment.  (See generally ECF No. 1; see also ECF No. 7-25.)[1]

Respondent has filed an Answer and has lodged the relevant state court record.  (ECF Nos. 6-7.)  Respondent maintains that habeas relief is unavailable because the state court adjudication of Petitioner's claims on the merits is neither contrary to or an unreasonable application of clearly established federal law nor based on an unreasonable determination of the facts.  (ECF No. 6 at 2.)  Petitioner has filed a Traverse.  (ECF No. 8.)

For the reasons discussed, the Court **DENIES** the Petition for a Writ of Habeas Corpus and **DENIES** a Certificate of Appealability.

## I.   <u>PROCEDURAL HISTORY</u>

In a second amended Information arising from events that took place on or about April 17, 2016, Petitioner and his co-defendant Roberto Banuelos were charged with one count of murder in violation of Cal. Penal Code § 187(a) and Petitioner was charged with an additional allegation that he personally used a deadly weapon, a knife, during the commission of the crime in violation of Cal. Penal Code § 12022(b)(1).  (CT 23-24.)  It was also alleged that Petitioner had two convictions and juvenile adjudications which were strike priors under Cal. Penal Code §§ 667(b)-(i), 1170.12, and 668; the first was a March 11, 1982 conviction in juvenile court for violations of Cal. Penal Code §§ 211 and 12022.5 and the second an August 11, 1982 conviction in juvenile court for a violation of Cal. Penal Code § 211.  (CT 24.)  Banuelos pled guilty to voluntary manslaughter, admitted his priors and testified for the prosecution in exchange for a reduced sentence of 18 years. (Reporter's Tr. ["RT"] 2610-11 [ECF No. 7, Lodgment Nos. 4-21].)

///

---

[1] In the Petition, Petitioner specifically incorporates by both reference and attachment the same four claims previously raised in his California Supreme Court petition for review.

On July 24, 2017, after a jury trial, the jury returned a verdict of guilty of second degree murder on count one and found true the allegation that Petitioner personally used a deadly or dangerous weapon during the commission of the murder.  (RT 444; CT 672.)  In a separate proceeding on August 1, 2017, the trial court made a true finding on the strike priors pursuant to Cal. Penal Code §§ 667(b)-(i), 1170.12, and 668.  (CT 675.)  On October 2, 2017, Petitioner was sentenced to 46 years to life.  (CT 696-97.)

On direct appeal to the California Court of Appeal, Petitioner raised the four claims raised in the instant federal Petition, as well as four additional claims not presented here.  (ECF No. 7-22.)  In a reasoned opinion issued on November 28, 2018, the state appellate court affirmed the judgment of conviction.  (ECF No. 7-24.)

Petitioner thereafter filed a petition for review in the California Supreme Court, raising only the four claims contained in the instant federal Petition.  (ECF No. 7-25.)  On February 27, 2019, the California Supreme Court denied the petition for review in an order which stated in full: "The petition for review is denied."  (ECF No. 7-26.)

## II.    FACTUAL BACKGROUND

The following facts are taken from the state appellate court opinion affirming the denial of Petitioner's appeal in People v. Vargas, D073025 (Cal. Ct. App. Nov. 28, 2018).  (See ECF No. 7-24.)  The state court factual findings are presumptively reasonable and entitled to deference in these proceedings.  See Sumner v. Mata, 449 U.S. 539, 545-47 (1981).

Prosecution

Roberto Banuelos and his girlfriend, Christina Vega, lived in a second floor apartment on Granger Street, around the corner from Fenton Place. Banuelos was a drug addict, who, in 2016, was working at a restaurant, but also sold drugs out of the apartment.   Vega was a heroin and methamphetamine dealer.  Vega had grown up with Jose Estrada, Jr., and she often sold him drugs.  Estrada lived around the corner from Vega and Banuelos on Fenton Place.

Banuelos and Vargas were friends.  Vargas often went to Banuelos and Vega's apartment to buy drugs.

On February 26, 2016, Vargas went to Banuelos and Vega's apartment. Estrada, who was at that apartment to buy methamphetamine, opened the door and asked Vargas where he was from. Estrada and Vargas's interaction turned physical with both men falling down the stairs. After the men got up, Estrada pulled out a gun and shot at Vargas as he ran toward his car, which was parked on the street. As Vargas was leaving, he warned Estrada that he was going to come back and get him.

Around midnight, Vargas, accompanied by two of his brothers and several nephews, returned to the apartment looking for Estrada. They demanded to know where Estrada lived. Vega lied and said that she did not know. She did not tell the Vargases where Estrada lived because she "didn't want anything to happen to (him)." When they left, Vargas promised he would be back to get Estrada and said, "I'm going to fuck him up." Vargas sent texts to Banuelos a few times after that night, asking if Estrada had been by Banuelos's apartment.

About a month and a half later, on the night of April 16, Estrada burst into Banuelos and Vega's apartment with a gun, looking for Vargas and his brothers. After Estrada left, Vega sent Vargas a text, warning that Estrada had a gun and was looking for him.

Early in the morning on April 17, Estrada returned to the apartment with some sort of metal object. He struck the security screen door, damaging it, making it difficult to open. As he was hitting the door, Estrada yelled at Banuelos, "come outside" and "I told you, motherfucker, about the Vargases, about them being at your house." About a half hour to an hour later, Vargas arrived at Banuelos's apartment to buy methamphetamine from Vega and to drive Banuelos to his Narcotics Anonymous meeting. Banuelos told Vargas that Estrada was there earlier and was "acting all crazy."

Vargas suggested that they go talk to Estrada. Banuelos thought they were going to "rough up" Estrada. Banuelos and Vargas walked toward Estrada's house. They walked up Granger Avenue, and turned left on Fenton Place. As they walked up Fenton Place, they split up and walked on opposite sides of the street to keep Estrada from getting away. Estrada was standing in the street arguing with his friend, Michael Dexter. When Estrada noticed Vargas and Banuelos approaching, he ran. With Vargas and Banuelos in pursuit, Estrada jumped over a wall at Ed Black's residence,[2] ran along the side of the house and through the backyard. The chase continued into the

backyard of the neighboring property to the north and proceeded through a second backyard before ending in a vacant lot.

> [2] Black lived in the house next door to Estrada. Juan and Carmen Richards lived behind Black, and to the west of the Richards's house was a vacant lot. The Richards's property was about three or four feet lower than Black's property, and there was no impediment that would prevent a person from dropping down into the Richards's backyard from Black's backyard.

Vargas initially stabbed Estrada in the southeast corner of the Richards's property, near a shed in the backyard. However, Estrada was able to leave the Richards's property and travel to the adjacent vacant lot. Vargas and Banuelos also left the Richards's property, and the confrontation continued in the vacant lot. Banuelos, who was closer to Estrada, grabbed Estrada's shoulder and spun him around. Estrada, who at some point had picked up a shovel, swung it at Banuelos but Banuelos ducked, avoiding the blow. Vargas, however, was hit in the chest. Estrada then jabbed at Vargas with the shovel. Vargas grabbed Estrada and got on top of him. He stabbed Estrada until he was no longer moving and there was blood coming out of his mouth.

As Estrada lay on the ground bleeding, Vargas and Banuelos fled. Vargas, who had lost his phone, told Banuelos to call Vega and tell her to pick them up in Vargas's car.

Meanwhile, Dexter ran down to the vacant lot to help Estrada. Two nearby residents, who heard the fighting from inside of their house, went down to help, and they sent Dexter to a nearby fire station. The two others moved Estrada away from a wood pile, and after laying him on the ground, attempted to stop the bleeding. Medical personnel arrived and transported Estrada to the hospital, where he died during emergency surgery.

When Vega arrived, Vargas got into the backseat, and Banuelos got into the front passenger seat. After seeing a lot of blood on Vargas, Vega asked them what they had done. Banuelos also asked Vargas, "What was that about?" Vargas responded, "What did you think was going to happen?" Banuelos replied, "Not that." Vargas also said, "I got him. I got him good." Vargas also advised Banuelos and Vega not to talk about what happened. Before dropping Banuelos off at his Narcotics Anonymous meeting, the group stopped at a methadone clinic for Vargas. Vargas took off his bloody

sweatshirt before going into the clinic.  Later that day, when Vega met Vargas to drop off his car, Vargas asked her to look for a knife that he had dropped across the street from the vacant lot where the stabbing took place.

Vargas had stabbed Estrada in his right side, near his back, lacerating his diaphragm, liver, and kidney.  Estrada also suffered two incised wounds, which were caused by a knife or sharp object, but the wounds were longer whereas a stab wound was deeper in the body.  One of the incised wounds was on his right back side, and the other was on his right elbow area.  Estrada also had bruising and contusions on his face and head.  There were also multiple abrasions on his hands and arms and bruising and abrasions on his legs.

Vargas sustained a small scratch on his chest, a couple of abrasions on his legs, and some small abrasions on his hands.

Vargas's cell phone was found in a pool of blood near where he left Estrada.  DNA found under Estrada's fingernails was consistent with Vargas's DNA.

The day after the killing, Vargas's brothers went to Banuelos and Vega's apartment and asked them questions about Dexter.  The Vargases believed that Dexter was talking to someone about the killing, and they wanted to find Dexter and give him a "hot shot," which was a lethal dose of heroin or similar type of drug.

During a recorded jailhouse phone call, Vargas told his brother that "they" were saying he committed first degree murder, but that he was not in town on the day the murder was committed—he was in Norwalk with his brother.

Defense

Vargas testified in his own defense.  He stated that on an evening in February 2016, he went to Banuelos' apartment, only to be met at the door by Estrada, a stranger, not Banuelos.  Confronting Vargas at the door, Estrada asked, "Who the fuck are you?"  Estrada then blocked the door and pushed Vargas backwards.  Vargas turned and ran down the stairs, Estrada chasing after him.  As Vargas was fleeing, he heard a shot from behind, quickly got into his car, and left.

///

Later that evening, Vargas returned to Banuelos's apartment, seeking to find out why Estrada was hostile toward him. Vargas emphasized that he made no threats, did not attempt to go to Estrada's home, and did not try to contact Estrada.

Several weeks later, on the evening of April 16, 2016, Vargas received a text from Vega, relaying to him what Estrada had done in her apartment. She said Estrada had shown up, asking about Vargas's family. She told Vargas that Estrada had a gun, and she warned Vargas to be careful.

The next morning, Vargas went to Banuelos's apartment to take him to his Narcotics Anonymous meeting. He claimed to have no intent of harming Estrada that day. When he arrived at the apartment, he noticed the apartment door had been damaged. Banuelos told him Estrada had just been there and had smashed in the door. Banuelos said he needed "to go get at this dude," and Vargas indicated his willingness to go "along with him." They started walking off in search of Estrada.

Vargas believed Banuelos was going to get into a fist fight with Estrada. As they were walking down Fenton Place, they separated and walked on separate sides of the street. Vargas saw Estrada and Dexter arguing in the street ahead. When they got within about 15 feet of Estrada, Estrada started running. Banuelos ran after him, running from across the street, following Estrada into the yard of the Black's residence on Fenton Place. Vargas followed some five or six feet behind Banuelos.

As Vargas jumped over the backyard fence of that home into the backyard of the Richards's residence, he saw Estrada reaching down for something. Vargas landed between Banuelos and Estrada, at which point Estrada came at him with a shovel. Vargas jumped back as Estrada swung at him. Estrada swung the shovel again, hitting Vargas in the shoulder. When he saw Estrada with the shovel, Vargas pulled out his knife, which he carried as a tool required for his job, "doing demolition."[3] Vargas stabbed Estrada one time. Vargas and Banuelos eventually left the corner of the backyard and headed out on a "little sidewalk(.)" They followed the sidewalk to a vacant lot. Banuelos arrived first at the vacant lot, followed by Vargas with Estrada six or seven feet away from Vargas.

[3] He insisted he did not take out his knife until Estrada swung the shovel at him.

Estrada was still holding the shovel when they got to the vacant dirt lot. He was holding it like a baseball bat. Estrada then rushed at Vargas, swinging the shovel, and hitting him in the chest with it. Because he jumped back, he did not receive the full impact of the hit, but he fell to the ground. On the ground, Vargas protected himself by raising his legs to block Estrada's strikes with the shovel. He used his knife again, believing that if he did not use it, Estrada "was going to end up getting (him) good with that shovel." After Estrada swung the shovel a third time, Vargas was able to get up and "hit (Estrada) again" with his knife, and Estrada backed up and fell down. Vargas then walked away. He explained that he did not stay to describe to the police what had happened because he did not think the police were going to believe him.

(ECF No. 7-24 at 2-9.)

## III.   DISCUSSION

Petitioner contends his federal constitutional rights to due process and a fair trial were violated because (1) the trial court committed prejudicial error in instructing the jury with an incorrectly modified version of CALCRIM No. 252, (2) the jury instructions provided in CALCRIM Nos. 570 and 571 were defective due to the omission of the requisite mental state for voluntary manslaughter, (3) CALCRIM No. 3472 was incorrect and unable to be understood by the jury by reference to the other provided instructions, and (4) the consideration of Petitioner's prior juvenile adjudications in sentencing, which also violated his right to equal protection and resulted in cruel and unusual punishment. (See generally ECF No. 1; see also ECF No. 7-25.) Respondent maintains habeas relief is unavailable because the state court adjudication of Petitioner's claims on the merits is neither contrary to or an unreasonable application of clearly established federal law nor based on an unreasonable determination of the facts. (ECF No. 6 at 2.)

### A.   Standard of Review

This petition is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254 ("AEDPA"). 28 U.S.C. § 2254(d). Pursuant to AEDPA, a state prisoner is not entitled to federal habeas relief on a claim that the state court adjudicated on the merits, unless it: "(1) resulted in a decision that was contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Harrington v. Richter, 562 U.S. 86, 97-98 (2011), quoting 28 U.S.C. § 2254(d)(1)-(2). Moreover, even if § 2254(d) is satisfied or does not apply, a reviewing habeas court must still determine whether the petitioner has established a federal constitutional violation. See Fry v. Pliler, 551 U.S. 112, 119 (2007) (§ 2254(d) "sets forth a precondition to the grant of habeas relief . . . , not an entitlement to it."); see also Frantz v. Hazey, 533 F.3d 724, 735-36 (9th Cir. 2008) (en banc).

A decision is "contrary to" clearly established law if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413 (2000). A decision involves an "unreasonable application" of clearly established federal law if "the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." Id.; Bruce v. Terhune, 376 F.3d 950, 953 (9th Cir. 2004). With respect to section 2254(d)(2), "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable– a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007), citing Williams, 529 U.S. at 410. "State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'" Rice v. Collins, 546 U.S. 333, 338-39 (2006), quoting 28 U.S.C. § 2254(e)(1).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Richter, 562 U.S. at 101, quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004). "If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation

of claims already rejected in state proceedings. . . . It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." <u>Richter</u>, 562 U.S. at 102.

In a federal habeas action, "[t]he petitioner carries the burden of proof." <u>Cullen v. Pinholster</u>, 563 U.S. 170, 181 (2011), citing <u>Woodford v. Visciotti</u>, 537 U.S. 19, 25 (2002) (per curiam).  However, "[p]risoner pro se pleadings are given the benefit of liberal construction."  <u>Porter v. Ollison</u>, 620 F.3d 952, 958 (9th Cir. 2010), citing <u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007) (per curiam).

**B.    Merits**

**1.    Claims One and Two- Voluntary Manslaughter Jury Instructions**

Petitioner asserts the trial court committed several errors in instructing the jury on voluntary manslaughter, violating his federal constitutional rights to a fair trial and due process.  In Claim One, Petitioner contends it was prejudicial error for the trial court to instruct the jury with a modified version of CALCRIM No. 252, which instructed that manslaughter was a specific intent offense, but failed to instruct that voluntary manslaughter could also be a general intent offense, while in Claim Two, Petitioner contends that jury instructions CALCRIM Nos. 570 and 571 (voluntary manslaughter based on heat of passion or provocation and imperfect self-defense, respectively) were defective because they failed to mention the requisite mental state for voluntary manslaughter.  (ECF No. 1 at 6-7; <u>see also</u> ECF No. 7-25 at 14-28.)  Respondent maintains that the state court adjudication of these claims, on the basis that CALCRIM Nos. 570 and 571 were legally correct and the error in CALCRIM No. 252 was harmless, was neither contrary to nor an unreasonable application of clearly established federal law.  (ECF No. 6-1 at 14.)

Petitioner raised these claims in a petition for review in the California Supreme Court and the California Supreme Court's denial was without explanation.  (<u>See</u> ECF Nos. 7-25, 7-26.)  The United States Supreme Court has repeatedly stated that a presumption exists "[w]here there has been one reasoned state judgment rejecting a federal claim, later

unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."  Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991); see also Wilson v. Sellers, 584 U.S. ___, 138 S.Ct. 1188, 1193 (2018) ("We conclude that federal habeas law employs a 'look through' presumption.").  Given the lack of any record evidence or argument attempting to rebut this presumption, the Court will "look through" the California Supreme Court's summary denial to the reasoned opinion issued by the state appellate court with respect to Claims One and Two, which the state appellate court adjudicated together.  See Ylst, 501 U.S. at 804 ("The essence of unexplained orders is that they say nothing.  We think that a presumption which gives them *no* effect- which simply 'looks through' them to the last reasoned decision- most nearly reflects the role they are ordinarily intended to play.") (footnote omitted).

The California Court of Appeal first discussed and outlined the elements of murder and lesser included offenses to murder, noting Petitioner was convicted of second degree murder, which is a killing with malice but without the additional elements required for first degree murder, as well as that "[u]nlike murder, manslaughter lacks the element of malice." (ECF No. 7-24 at 10-11.)  The state court recognized heat of passion or unreasonable self-defense could reduce murder to voluntary manslaughter, in that: "Heat of passion reduce(s) an intentional, unlawful killing from murder to voluntary manslaughter by negating the element of malice that otherwise inheres in such a homicide (citation)," and "[s]imilarly, unreasonable self-defense preclude(s) the formation of malice and reduce(s) murder to voluntary manslaughter(.)" (Id. at 11) (internal quotations and citations omitted.)  After stating "[a]lthough voluntary manslaughter can be committed intentionally, specific intent to kill is not always a necessary element of that crime; voluntary manslaughter also is committed when one kills unlawfully, and with conscious disregard for life, but lacks malice because of provocation or imperfect self-defense," (see id. at 12), the state appellate court then reasoned and concluded as follows:

> Below, with the agreement of all counsel, the trial court instructed the jury concerning first degree murder and its lesser included offenses.  To this

end, the court instructed the jury as to murder (CALCRIM No. 520), first degree premeditated and deliberated murder (CALCRIM No. 521), the effect of provocation on murder (CALCRIM No. 522), voluntary manslaughter based on heat of passion or provocation (CALCRIM No. 570), and voluntary manslaughter based on imperfect self-defense (CALCRIM No. 571). Additionally, with the agreement of counsel, the court provided a modified "concurrence instruction" under CALCRIM No. 252. Here, Vargas challenges the giving of CALCRIM Nos. 252 and 571. We will address the latter first.

The trial court instructed the jury under CALCRIM No. 571 as follows:

"A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect self-defense or imperfect defense of another. If you conclude that the defendant acted in complete self-defense or defense of another, his actions were lawful, and you must find him not guilty of any crime.

"The (difference) between complete self-defense or defense of another and imperfect self-defense or imperfect defense of another depends on whether the defendant's belief and the need to use deadly force was reasonable.

"The defendant acted in imperfect self-defense or imperfect defense of another if, one, the defendant actually believed that he or someone else was in imminent danger of being killed or suffering great bodily injury; and, two the defendant actually believed that the immediate use of deadly force was necessary to defend against the danger, but, three, at least one of those beliefs was unreasonable.

"Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. In evaluating the defendant's beliefs, consider all of the circumstances as they were known and appeared to the defendant.

"A danger is imminent if when the fatal wound occurred, the danger actually existed or the defendant believed it existed. The danger must seem immediate and present so that it must be instantly dealt with. It may not be merely prospective or in the

near future.

"Imperfect self-defense does not apply when the defendant, through his own wrongful conduct, has created circumstances that justify his adversary's use of force.

"If you find José Estrada Jr. threatened or harmed the defendant or others in the past, you may consider that information in evaluating the defendant's beliefs.  (¶) . . . (¶)

"Great bodily injury means a significant or substantial physical injury.  It is an injury that is greater than minor or moderate harm.

"The People have the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect self-defense or imperfect defense of another.  If the People have not met this burden, you must find the defendant not guilty of murder."

Vargas challenges CALCRIM No. 571 here, arguing that the instruction "nowhere makes it clear that voluntary manslaughter can lie even where intent to kill is not present."  In other words, Vargas argues that CALCRIM No. 571 should include some statement that informs the jury that a killing in imperfect self-defense, whether intentional or in conscious disregard of life, is voluntary manslaughter.

In *People v. Genovese* (2008) 168 Cal.App.4th 817 (*Genovese*), the defendant challenged CALCRIM No. 571 in the same fashion Vargas does here. (*Genovese*, *supra*, at p. 825.)  The jury in *Genovese* was instructed with the same principles of murder and voluntary manslaughter as Vargas's jury was instructed.  The jury in *Genovese* was told "'(a) killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.'" (*Id.* at p. 831; italics omitted.)  Based on this language the court explained: "The killing could not 'otherwise be murder' unless the jury found defendant intended to kill the victim or acted with conscious disregard for human life, and the jury was so informed in the instruction defining murder (i.e., that to prove murder, the prosecution must prove defendant acted with malice aforethought, and there are two kinds of malice aforethought—express, which requires intent to kill, and implied, which requires conscious disregard for human life)." (*Id.* at pp. 831-832.)  The court rejected the defendant's argument that, once the jury determined express or implied malice was

present, it was not told it could still find the defendant guilty of voluntary manslaughter if it believed he acted in the heat of passion.  The court noted the plain language of the instructions informed the jury that a killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant acted on a sudden quarrel or in the heat of passion.  (*Id.* at p. 832.)

As in *Genovese*, *supra*, 168 Cal.App.4th 817, the trial court here relied on the appropriate pattern instructions to explain to the jury that a killing "that would otherwise be murder" is reduced to voluntary manslaughter if the defendant killed a person during a sudden quarrel or in the heat of passion and that the killing could not "otherwise be murder" unless the jury found the defendant either had intended to kill the victim or acted with conscious disregard for human life.  Further, the jury was told multiple times that the presence of provocation served to reduce murder to voluntary manslaughter. Therefore, the court's instructions correctly informed the jury that a killing on a sudden quarrel or in the heat of passion, is voluntary manslaughter.

We find the reasoning in *Genovese*, *supra*, 168 Cal.App.4th 817 persuasive and conclude CALCRIM No. 571 correctly states the law.  Thus, we find no error in general in that the trial court provided that instruction.

However, Vargas crafts an additional argument that makes his case somewhat different than what the court addressed in *Genovese*, *supra*, 168 Cal.App.4th 817.  Here, Vargas complains that the trial court specifically told the jury that voluntary manslaughter is a specific intent crime as part of the modified concurrence instruction (CALCRIM No. 252).

In discussing the potential jury instructions, the trial court pointed out that the crime of manslaughter needed to be added to CALCRIM No. 252 because it was a specific intent crime.  Both the prosecutor and defense counsel agreed to modify the instruction.  The court thus instructed the jury per CALCRIM No. 252 as follows:

"The crime and other allegations charged in Count 1 require proof of the union or joint operation of act and wrongful intent. The following allegation requires general criminal intent, personal use of a deadly or dangerous weapon, as charged in Count 1.  For you to find the allegation true, that person must not only commit the prohibited act, but must do so with wrongful intent.

"A person acts with wrongful intent when he or she intentionally does a prohibited act. However, it is not required that he or she intend to break the law.

"The act required is explained in the instructions for that allegation.

"The following crimes require a specific intent or mental state, murder, as charged in Count 1, and manslaughter, a lesser crime to murder.

"For you to find a person guilty of these crimes, that person must not only intentionally commit the prohibited act, but must do so with a specific intent or mental state. The act and the specific intent or mental state required are explained in the instruction for those crimes."

Vargas claims the modified CALCRIM No. 252 instruction was incorrect because voluntary manslaughter is not only a specific intent crime, but can be committed when the defendant acts with conscious disregard for life. We agree. (See *Blakely*, *supra*, 23 Cal.4th at p. 91 ("We conclude that only that a defendant who, *with the intent or with conscious disregard for life,* unlawfully kills in unreasonable self-defense is guilty of voluntary manslaughter."); *Martinez*, *supra*, 154 Cal.App.4th at p. 336 ("(V)oluntary manslaughter can be committed either with an intent to kill or with conscious disregard for human life-specific intent is not always a required element.").) Therefore, Vargas maintains that the court committed prejudicial error when it improperly instructed the jury under CALCRIM No. 252.

In support of his position, Vargas asserts *Martinez*, *supra*, 154 Cal.App.4th 314 is instructive. In that case, the defendant killed a mini-market clerk during a fight. (*Id.* at pp. 319-321.) He was convicted of second degree murder. On appeal, the defendant argued, among other issues, that the court's reference to voluntary manslaughter as a specific intent crime, within CALCRIM No. 252, was improper. However, the court noted that earlier in the CALCRIM No. 252 instruction, the court has instructed the jury that voluntary manslaughter could be a general intent crime as well if the defendant committed the act without the intent to kill, but with conscious disregard for human life. (*Martinez*, *supra*, at p. 336.) The appellate court determined that the modified CALCRIM No. 252 instruction was proper, but stated that even if the instruction could be construed as requiring the jury to

find a specific intent to kill for manslaughter, and such instruction was improper, the failure to properly instruct the jury on voluntary manslaughter was not prejudicial error. (*Martinez*, *supra*, at p. 337.) In support of its conclusion, the court observed that the trial court properly instructed the jury on the elements of murder, including express and implied malice, and on the elements of voluntary manslaughter under both the theories of heat of passion and imperfect self-defense. Accordingly, the court concluded that any confusion among the jurors as to the differences between murder and voluntary manslaughter was minimal. (*Id.* at p. 337.)

In insisting that we should follow *Martinez*, *supra*, 154 Cal.App.314, Vargas claims that the appellate court there found the instruction was not prejudicial because the trial court also instructed that voluntary manslaughter could be a general intent crime. Vargas misreads *Martinez*. In that case, the court found the CALCRIM No. 252 instruction was proper. Nevertheless, it assumed the instruction was improper (i.e., instructed the jury that voluntary manslaughter was only a specific intent crime, the same as the court instructed the jury in the instant matter), but determined the error was not prejudicial because: (1) the court properly instructed the jury on the elements of murder and manslaughter in addition to CALCRIM No. 252 and (2) under the evidence presented at trial, it was unlikely the jury would have returned a different verdict had the claimed instructional error not occurred. (*Martinez*, *supra*, at p. 337.) In this sense, *Martinez* is helpful here, just not the way Vargas advocates.

In the instant matter, by instructing the jury that involuntary manslaughter is a specific intent crime, without explaining that it also can be a general intent crime, the court erred. (See *Blakely*, *supra*, 23 Cal.4th at p. 91; *Martinez*, *supra*, 154 Cal.App.4th at p. 336.) We therefore must determine if the error was prejudicial. To do so, we evaluate the instructional error under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818. (*Martinez*, *supra*, at p. 337.) A conviction of the charged offense may be reversed in consequence of an instructional error only if it appears more reasonably probable that the defendant would have obtained a more favorable outcome had the error not occurred. (*Watson*, *supra*, at p. 836; *People v. Lasko* (2000) 23 Cal.4th 101, 111.)

In the instant action, like in *Martinez*, the court properly instructed the jury on the elements of murder, express and implied malice, and the elements of voluntary manslaughter under both theories of heat of passion and imperfect self-defense. Explicitly, the jury was instructed that the prosecution

had to prove that Vargas did not kill Estrada in the heat of passion or imperfect self-defense to prove murder.   Thus, like the court in *Martinez*, we too conclude that any confusion caused by the incorrect CALCRIM No. 252 instruction was minimal, and the jury understood the differences between murder and voluntary manslaughter.   (*Martinez*, *supra*, 154 Cal.App.4th at p. 337.)

Moreover, in the light of the evidence, it is unlikely that the jury would have returned a different verdict had the instructional error not occurred. Vargas accompanied Banuelos in looking for Estrada.   After finding Estrada, they chased after him until they cornered him in a backyard where Vargas stabbed Estrada.   Then Vargas and Banuelos again fought with Estrada in a nearby vacant lot, and Vargas stabbed Estrada multiple times, ultimately killing him.

The jury also heard evidence after the killing that strongly supported Vargas's conviction for second degree murder.   Vargas fled the scene of the crime, got rid of the knife and his bloody sweatshirt, and tried to create an alibi with his brother.   In the getaway car, Vargas said, "I got him.   I got him good."   Vargas also advised Banuelos and Vega not to talk about what happened.   And, the day after the killing, Vargas's brothers went to Banuelos and Vega's apartment and asked them questions about Dexter. The Vargases believed that Dexter was talking to someone about the killing, and they wanted to find Dexter and give him a lethal dose of heroin or similar type of drug.

In addition, the jury was instructed that "(t)he People have the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect self-defense or imperfect defense of another.   If the People have not met this burden, you must find the defendant not guilty of murder."   The jury concluded the prosecutor proved that Vargas was not acting in imperfect self-defense, and thus, convicted him of second degree murder.   Against this backdrop, there was ample evidentiary support for the guilty verdict of second degree murder such that it is not reasonably probable that Vargas would have obtained a more favorable outcome had the concurrence instruction included the statement that voluntary manslaughter can be a general intent crime. Therefore, any error in the instruction was harmless.

(Id. at 12-20.)

First, given the California Court of Appeal specifically analyzed Petitioner's Claim One and Two contentions for error under state law only, the Court must determine whether

the state court adjudicated the federal aspects of those claims on the merits.  The Supreme Court has held that "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Harrington v. Richter, 562 U.S. 86, 99 (2011); see also Johnson v. Williams, 568 U.S. 289, 301 (2013) ("When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits—but that presumption can in some limited circumstances be rebutted.").

Petitioner contended in both the state appellate and state supreme courts that these instructional errors amounted to prejudicial errors under both the state and federal standards, arguing with respect to the latter that the instructional errors prevented the jury from fully and properly considering the lesser included offense of voluntary manslaughter in violation of his rights to a fair trial and to due process.  (See ECF No. 7-22 at 44-45, 53-54; ECF No. 7-24 at 20-21, 27-28.)  While the state appellate court concluded instructional error had occurred, that court evaluated the harmlessness of that error solely under Watson, which holds "[t]hat a 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error."  People v. Watson, 46 Cal. 2d 818, 836 (1956).  In state court, "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."  Chapman v. California, 386 U.S. 18, 24 (1967).  The Ninth Circuit has distinguished the two standards, noting: "The Watson standard is used to review non-constitutional, trial type errors," while "[i]n contrast, the more stringent standard, under Chapman v. California, is used to review errors of constitutional magnitude."  Hall v. Haws, 861 F.3d 977, 989 n.7 (9th Cir. 2017).

Given the absence of a federal Chapman analysis, it is unclear whether the state court ignored the federal aspect of Claims One and Two or instead concluded no federal error had occurred, only the latter of which would have rendered a federal harmlessness

determination unnecessary.  <u>See</u> <u>Williams</u>, 568 U.S. at 299-300 (recognizing reasons why "it is by no means uncommon for a state court to fail to address separately a federal claim that the court has not simply overlooked," including, but not limited to that "a state court may not regard a fleeting reference to a provision of the Federal Constitution or federal precedent as sufficient to raise a separate federal claim," as well as "there are instances in which a state court may simply regard a claim as too insubstantial to merit discussion.").

Regardless of whether the Court were to conclude the state court may have simply ignored or overlooked the federal aspect of the claim such that the <u>Williams</u> presumption could potentially be rebutted, or whether the state court may have found no federal error that would warrant a <u>Chapman</u> analysis, to merit habeas relief Petitioner must still also show that the claimed error had a "substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993); <u>see</u> <u>Fry</u>, 551 U.S. at 119 (§ 2254(d) "sets forth a precondition to the grant of habeas relief . . . , not an entitlement to it."); <u>see</u> <u>also</u> <u>Frantz</u>, 533 F.3d at 735-36.  As discussed below, because Petitioner fails to persuasively show any reasonable likelihood of a different verdict under <u>Brecht</u>, as it is evident the jury's verdict of second degree murder would not have been different absent the asserted instructional error concerning intent as it related to voluntary manslaughter, Claims One and Two do not merit federal habeas relief irrespective of whether the <u>Williams</u> presumption has been rebutted.

In Claim One, Petitioner argues that "[b]y incorrectly instructing as to voluntary manslaughter, the instruction given in the instant case did, in fact, served [sic] to limit the jury's consideration as to what otherwise was a valid lesser included offense."  (ECF No. 7-25 at 21.)  In Claim Two, Petitioner contends that "under the instruction given, the jury could have convicted petitioner of voluntary manslaughter on the theory that although he had no intent to kill Estrada, he nevertheless acted in conscious disregard for human life," but the instructional error "failed to give the jury the opportunity to decide whether he had this mental state, even though he was, in all probability, convicted of second degree murder on this very same principle."  (<u>Id.</u> at 27-28.)

The record reflects the jury was correctly instructed on the elements of murder, express and implied malice, and manslaughter, as well as that manslaughter was a lesser included offense to murder.  (CT 420-29.)   The jury was also specifically directed: "Provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter," which again, clearly reflected that manslaughter was a lesser crime than second degree murder.  (CT 424.)   Additionally, the jury was unambiguously instructed the prosecution bore the burden of proving that the killing was not committed due to a sudden quarrel, in the heat of passion, or due to imperfect self-defense or defense of another, and if the prosecution failed to so prove, the jury could not find Petitioner guilty of murder.  (See CT 426) ("The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion.  If the People have not met this burden, you must find the defendant not guilty of murder."); (see also CT 429) ("The People have the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect self-defense or imperfect defense of another.  If the People have not met this burden, you must find the defendant not guilty of murder.").  Given the verdict the jury reached in finding Petitioner guilty of second degree murder and upon consideration of the entirety of the trial court's instructions to the jurors, it is clear the jurors categorically found Petitioner did not act as the result of a sudden quarrel or heat of passion, nor did he act in imperfect self-defense or defense of another.

Nor does the Court find the evidence presented at trial renders it likely the jury would have returned a different verdict absent the asserted instructional errors.  It is instead plain that Petitioner and Banuelos went looking for Estrada upon Petitioner's suggestion, spurred by Estrada's visit to Banuelos' residence that very morning, and that Petitioner had previously and repeatedly sought to locate Estrada due to a prior violent incident between them where Estrada shot at Petitioner.  When Petitioner and Banuelos located him, Estrada fled; they pursued Estrada and Petitioner fought with him, during which Petitioner stabbed Estrada multiple times and killed him.  Petitioner's actions and comments after the murder further support a conclusion that the verdict would not have been different.

Evidence at trial reflected that several weeks before Estrada's death, Estrada and Petitioner had a confrontation of sorts at the Banuelos/Vega residence, during which Estrada, also known as Junior, shot at Petitioner; several hours later, Petitioner and his brothers returned to the residence looking for Estrada.  (RT 2533-34, 2542, 3266-77.)  Baneulos in particular described the earlier incident as follows: "Junior had went to the house and got into a scuffle with Raul, and he shot at Raul."  (RT 2533.)  Vega, who was in the residence at the time it happened, added that when Petitioner left after the incident, he screamed: "I'm going to come back for Junior."  (RT 3277.)

Both the night before Estrada was killed and early that next morning, Estrada visited the Banuelos/Vega residence.  The night before the killing, Estrada went into the apartment, armed with a gun and looking for Petitioner and/or "the Vargases."  (RT 2558, 3278-83.)  Early the next morning, Estrada again came over to the residence and pounded on the door and then left without entering.  (RT 2561.)  Banuelos, who had earlier arranged for Petitioner to give him a ride to his meeting, told Petitioner of Estrada's activities, and Petitioner suggested they go talk to Estrada.  (RT 2561-69.)  They approached Estrada arguing with Michael Dexter in the street, and Banuelos stated: "At that point Junior had his back towards us, and I started running towards him.  And he took off, and we ran after him."  (RT 2569.)  Per Banuelos, Estrada picked up a shovel when running and swung it; Banuelos ducked and it hit Petitioner, who went down.  (RT 2573-76.)  Estrada struck Vargas several times, while Baneulos told Dexter to stop yelling, and: "After, maybe, about five or six times, Junior struck Raul.  Raul, kind of like, grabbed him from the arm and pulled him down and got on top of him."  (RT 2576-78.)  Banuelos helped Petitioner up and away from the scene, during which time Petitioner said, "I got him," which Banuelos understood as follows: "I want to say he stabbed him."  (RT 2581-83.)  Banuelos admitted that he might have previously told a detective that Petitioner indicated: "I'm going to fuck him up" about Estrada and in response, Banuelos told Petitioner to keep it away from his own residence.  (RT 2655-56.)  With respect to the shovel jabs, Banuelos stated: "I probably won't say [Petitioner] was going to die, but I know he was going to get hurt."

(RT 2663.)  Banuelos also acknowledged that the purpose in catching Estrada that morning was: "I want to say probably rough him up."  (RT 2649.)

Vega testified that when Banuelos called her to be picked up, she saw blood on Petitioner's sweatshirt.  (RT 3288.)  Vega stated Banuelos asked Petitioner, "What was that about?" to which Petitioner replied, "What did you think was going to happen?" and Banuelos said, "Not that."  (RT 3289; see also RT 2587.)  According to Vega, Petitioner appeared: "Like nothing had happened," that is, neither angry or scared, but calm.  (RT 3289-90.)  Petitioner then "told us that we better not say anything," and stated: "That we know better.  That we shouldn't - - we better not say anything," and Petitioner included Dexter in his comments.  (RT 3290.)  According to Vega, Petitioner also stated: "I got him.  I got him good," noting: "It just came out.  Like, he got in the car and he said, 'I got him.  I got him good,'" and "[s]ounded like he was happy about it."  (RT 3291.)  Vega did not know who he was talking about at that time.  (Id.)

Evidence reflects that after Estrada's death, Petitioner not only fled the scene and failed to call police, but also made other efforts to conceal the evidence and obscure his involvement, including attempting to formulate an alibi and intimidate or silence witnesses.  Petitioner asked Vega "to go look for the knife that he dropped," which he said "was across the street from where the Black's  - - the backyard to where the incident had happened."  (RT 3297.)  Vega told him she would but did not.  (Id.)  Recorded jail phone calls reflected Petitioner and another member of the Vargas family discussing the morning Estrada was killed and Petitioner's assertion they were visiting an aunt in Norwalk at the time.  (CT 233-34; RT 3796-97.)  Petitioner's family members also sought to locate Dexter and expressed concerns that he might speak to police about the matter.  Several Vargas brothers came to the Banuelos/Vega residence the day after Estrada was killed and "wanted to know where [Dexter] was at because they said somebody was talking."  (RT 2604, 3301-02.)  The Vargases spoke of giving Dexter a "hot shot," which Vega described as "[a] shot that you either put so much heroin in, it will make somebody die.  Or you put poison in, when they inject it, they are going to die."  (RT 3302-03; see also RT 2605.)  Vega got scared and told

20cv0516 LAB (JLB)

Dexter "not to get into any cars with them or not to go anywhere by himself with them, not to take any dope from them."  (RT 3303.)  Vega also feared for herself, as the Vargas brothers also told her: "That we better not say anything or else we know what's going to happen."  (RT 3303-04.)

Criminalist Stephen Lu stated with respect to Estrada's injuries that "[t]he - - of the bloodstain evidence that I examined, Mr. Estrada suffered at least one bloodletting injury in the southeast corner of that lot by the shed, and then he proceeded to move from that area to the west towards the dirt lot."  (RT 2705.)  Testimony reflected that Estrada's cause of death was stab wounds to the liver and kidney.  (RT 2051.)  There was also testimony and photographic evidence offered concerning Petitioner's injuries, reflecting Petitioner had a small abrasion in the center of his chest about 1-1.5 inches in length, smaller abrasions to two fingers on his right hand and to his left hand, as well as abrasions on his left shin and right knee.  (RT 2331-38.)  DNA testing was performed on blood stains found on a sidewalk by the fence and by the stick piles, both matched Estrada and excluded Petitioner and Banuelos.  (RT 3771-3781.)  Blood and other stains on the shovel handle matched Estrada and excluded the others, while DNA evidence reflected one of Estrada's fingernail scrapings included both Estrada and Petitioner as contributors and excluded the others.  (RT 3777, 3781.)

Petitioner testified in his own defense that he and Banuelos went to talk to Estrada on Banuelos' behest, and they both ran after Estrada when he fled; after jumping a fence, Estrada swung a shovel at him twice, hitting him, and "I rushed down, I lowered down and I rushed into him and I stabbed him one time" with a knife he carried on his belt for work. (RT 3815-23.)  When Estrada swung at him, Petitioner believed that had he not acted, "he would have end up hurting me seriously" given that after jumping the fence, Petitioner was cornered.  (RT 3824.)  When they moved to the dirt lot, Estrada again swung the shovel like a bat and hit Petitioner in the chest, then jumped on him.  (RT 3825-27.)  Petitioner used his knife again because "I had to," as he had blocked some shots to his face with his feet, feared being hurt with the shovel, and did not have other weapons to defend himself.

20cv0516 LAB (JLB)

(RT 3828-30.)  Afterwards, Petitioner left the area because he did not feel safe and he did not think the police would believe him; he went to his aunt's in Norwalk later that day. (RT 3830-33.)   With respect to a recorded jail phone conversation with his brother during which Petitioner stated "I wasn't even here" on the day of the killing, Petitioner asserted that "I just didn't want to put my case on the phone" because he had already told his brother about defending himself, but also conceded, "I guess if you want to say it was a lie, yeah, it was a lie."  (RT 3736-37.)  Petitioner stated that he did not see Estrada or Banuelos hit one another and indicated that Estrada only swung at him.  (RT 3878-79.)

A review of the prosecutor's closing arguments to the jury reflects that the prosecutor focused the bulk of his comments on malice as it related to the murder charge, advocating for a verdict of first degree murder, as well as on the lack of self-defense.  (See RT 4057) ("This case is about that chase.  And as I go through the law and I go through the evidence that was presented in this trial, I'm confident that you will see that this case is about the chase.  The chase should convince you that this was nothing more than a cold, calculated, premeditated murder.  This was not self-defense."); (id. at 4072) ("The case is about that chase.  The chase shows the intent to kill.  Express malice."); (id. at 4073-74) ("And clearly there is implied malice in this case.  I'm not going to go into as much detail.  But when you take a knife and you stab someone with it, knowingly, intentionally.  This wasn't an accident.   José Estrada did not fall on that knife.   He intentionally -- Raul Vargas intentionally took that blade and shoved it into the body of José Estrada.  Everyone knows that's a dangerous act, the natural and probable consequences of which are dangerous to human life."); (id. at 4077) ("You don't get to go chasing after your victim and then claim self-defense when the victim tries to defend his own life from two men chasing after him, two men with motives to hurt him."); (id. at 4080) ("Self-defense does not allow -- does not provide justification for the killer if he intended to kill.  Remember, the motivation has to be -- the motivation to kill had to only have been because he was so afraid and he had no other recourse but to act in self-defense.  If he went there with the intent to kill, which the evidence has shown, no justification.  He went hunting.  He brought the deadly weapon.

24

He chased after the victim, and the victim fought for his own life. [¶] When all three elements have been proven, as they have in this case, we are left with murder.").

However, the prosecutor also briefly discussed the heat of passion and imperfect self-defense manslaughter and asserted that manslaughter under either theory was an inappropriate verdict given the factual circumstances of the case.   The prosecutor referenced the late February incident to argue that the mid-April killing, which took place about 50 days later, could not have been due to heat of passion, stating: "You can't excuse or somehow negate malice if the average person would have cooled off by then." (RT 4093.)  The prosecutor also argued against imperfect self-defense, contending: "When you chase a person into a place where they have no retreat and they need to pick up a shovel to defend their own life, you can't then say 'Oh, no matter what, I'm going to use deadly force.'  Reasonable or not, it doesn't apply, and that's the chase."  (RT 4094.)

Even to the extent the prosecutor's argument could have potentially confused the issue between implied malice second degree murder and voluntary manslaughter, the jurors were advised that arguments and other remarks by counsel were not evidence.  (CT 383) ("Nothing that the attorneys say is evidence.  In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence.  Their questions are not evidence.  Only the witnesses' answers are evidence.  The attorneys' questions are significant only if they helped you to understand the witnesses' answers.  Do not assume that something is true just because one of the attorneys asked a question that suggested it was true.").  The trial court additionally instructed the jurors that in the event of conflict with comments by counsel, the jurors must follow the court's instructions. (CT 378) ("You must follow the law as I explain it to you, even if you disagree with it.  If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions.").  Just before the closing arguments to the jury, the trial court reminded jurors: "Again, you are the judges of the facts.  So if either of the sides says something that you don't think is proved, go with what you heard and what the facts are. And similarly, go with the law I gave if it happens to have been misstated."  (RT 4056.)

20cv0516 LAB (JLB)

As noted earlier, the trial court correctly instructed jurors the prosecution bore the burden of proving Estrada's killing was not voluntary manslaughter, either due to quarrel, heat of passion, imperfect self-defense, or imperfect defense of another, and if the prosecution failed to meet any of those burdens, the jury's verdict must be not guilty of murder.  As such, for the jury to reach the second degree murder verdict rendered, they would have had to also conclude the prosecution had met its burden to prove the killing was not voluntary manslaughter.  Those instructions, coupled with the evidence presented at trial, preclude any conclusion that the jurors were somehow prevented from properly considering voluntary manslaughter.  Moreover, as discussed in greater detail with respect to Claim Three below, the defense did not argue in closing that the killing was voluntary manslaughter by way of heat of passion or imperfect self-defense, but instead primarily asserted Petitioner committed the killing in reasonable self-defense.  (See e.g. RT 4096-97) ("But for you, as jurors, to decide whether or not Raul Vargas was faced with a life-or-death situation and had to act to defend himself, you need to look no further than the space behind the Black's house.  You need to look no further than the shovel in José Estrada's hands.  And you need to look no further than the government's own witnesses because the government's own witnesses corroborate, support, and confirm everything Raul Vargas told you about his need to act. [¶] This case is not about the chase.  This case is about the shovel.  Because, Ladies and Gentlemen, when you are faced in that situation with a shovel coming at your head, you have the right to defend yourself.  Common sense supports it and the law supports it.").  Had the jury believed the defense, which contended Petitioner killed Estrada in "justifiable legal self-defense" (see RT 4109), Petitioner would not have been convicted of either murder or manslaughter.  In any event, the defense argument also correctly noted that voluntary manslaughter was an option for the jurors and that the prosecution bore the burden of disproving both it and the defense theory of legal self-defense.  (See e.g. RT 4110) ("[I]t's the government's burden to show that it was not imperfect self-defense and that it was also not justifiable, legal self-defense.").

///

20cv0516 LAB (JLB)

In view of the considerable evidence supporting the second degree murder conviction as well as the jury instructions specifically requiring the prosecution to disprove manslaughter and self-defense and prove the elements of murder in order to return the verdict they reached, the Court is not persuaded that the error in instructing voluntary manslaughter was a specific intent offense and the failure to instruct it could also be a general intent offense, had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637.  Instead, given the evidence presented and the complement of jury instructions provided, any error was clearly harmless.  Accordingly, habeas relief is not warranted on Claims One and Two.

## 2. <u>Claim Three- Jury Instructions Regarding Self-Defense</u>

In Claim Three, Petitioner contends that his federal right to a fair trial and due process were violated when the jury was instructed with CALCRIM No. 3472, which prevented the jury from properly considering his claim of self-defense.  (ECF No. 1 at 8; <u>see also</u> ECF No. 7-25 at 29-34.)  Respondent maintains the state court adjudication of this claim was neither contrary to nor an unreasonable application of clearly established federal law.  (ECF No. 6-1 at 18.)

As with the prior claims, the California Supreme Court's denial was without explanation or a statement of reasoning.  (<u>See</u> ECF No. 7-26.)  Accordingly, the Court will again "look through" the California Supreme Court's summary denial to the reasoned opinion issued by the state appellate court with respect to Claim Three.  <u>See</u> <u>Ylst</u>, 501 U.S. at 804.  The California Court of Appeals rejected this claim, reasoning as follows:

> Vargas claims an instructional error with respect to CALCRIM No. 3472 (Right to Self-Defense: May Not Be Contrived).  Per that instruction, the jury was told: "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force."  Vargas argues the instruction's categorical language erroneously told the jury that Vargas forfeited his claim to self-defense if he provoked the fight with the intent to create an excuse to use force.

> Vargas suggests the instruction foreclosed the jury from considering the following version of events.  Vargas accompanied Banuelos in going after

Estrada, but he had no intent to kill Estrada.  Instead, he was backing up Banuelos, who he believed would get in a fistfight with Estrada.  When they caught up to Estrada, however, Estrada attacked them with a shovel.  Estrada beat Vargas to the ground, causing Vargas to fear for his life so he took out his work knife that he always carried on his person.  In self-defense, Vargas stabbed Estrada with his knife and then stabbed him again after Estrada had him down on the ground and continued to hit him with the shovel.  We disagree with Vargas that CALCRIM No. 3472 prevented the jury from considering his version of events.

We recognize that the categorical terms of CALCRIM No. 3472 may not be correct in all circumstances.  A defendant may have a claim to self-defense if he provokes a fight using only nondeadly force, and the victim unlawfully responds with deadly force.  (*People v. Vasquez* (2006) 136 Cal.App.4th 1176, 1179-1180.)  Alternatively stated, when an adversary suddenly escalates a confrontation to deadly violence in response to a defendant's use of nondeadly force, the defendant may still invoke self-defense.  (*People v. Frandsen* (2011) 196 Cal.App.4th 266, 273 ("Only when the victim resorts to unlawful force does the defendant-aggressor regain the right of self-defense." (Italics omitted.)).)  Thus, a defendant does not forfeit his right to self-defense in all cases in which he seeks a fight while intending to create an excuse to use force.

Although CALCRIM No. 3472 read alone seems to foreclose a claim of self-defense whenever a defendant provokes a fight, we must examine the instructions as a whole and presume the jury correlated the instructions.  (*People v. Houston* (2012) 54 Cal.4th 1186, 1229-1230; *People v. Sanchez* (2001) 26 Cal.4th 834, 852.)  And the court here correctly instructed the jury on when self-defense is still available to a defendant who is the initial aggressor.

The court instructed the jury with CALCRIM No. 3471 (Right to Self–Defense:  Mutual Combat or Initial Aggressor), which stated in pertinent part:  "(I)f the defendant used only nondeadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting, or communicate the desire to stop to the opponent or give the opponent a chance to stop fighting."[4]  The jury was therefore aware that if Vargas used only nondeadly force, and Vargas believed Estrada was responding with sudden and deadly force, Vargas could claim he responded with deadly force in self-defense.  We do not think there

is a reasonable likelihood the jurors applied CALCRIM No. 3472 in an impermissible manner, when read in context with CALCRIM No. 3471. (*People v. Houston*, *supra*, 54 Cal.4th at p. 1229.)

> [4] Vargas also claims the trial court prejudicially erred by instructing the jury under CALCRIM No. 3471 because that instruction was not supported by substantial evidence. We reject this argument as explained below.

Here, to support his argument, Vargas primarily relies on the majority decision in *Ramirez*, *supra*, 233 Cal.App.4th 940, but as we shall explain, his reliance is misplaced.  The court in *Ramirez* acknowledged that "CALCRIM No. 3472 states a correct rule of law in appropriate circumstances." (*Ramirez*, *supra*, at p. 947.)  But the facts and arguments before the jury in *Ramirez* erroneously required the jurors to conclude the defendants had entirely forfeited any right to self-defense.  (*Id.* at p. 953.)  The evidence established two codefendants had provoked a fistfight with rival gang members.  (*Id.* at p. 944.)  One of the defendants testified that he stepped back from the melee and saw a rival walking toward him; he thought the rival had something black in his hand that looked like a gun, and the rival raised his hand.  The defendant then drew a gun from his sweatshirt pocket and fatally shot the rival.  (*Id.* at p. 945.)  The trial court instructed the jury with both CALCRIM Nos. 3471 and 3472.  (*Ramirez*, *supra*, at pp. 945-946.)

The court found the prosecutor repeatedly misstated the law of self-defense during closing argument by arguing that, based on CALCRIM No. 3472, the codefendants' use of any force—"even nondeadly fisticuffs"—forfeited any claim of self-defense.  (*Ramirez*, *supra*, 233 Cal.App.4th at pp. 943, 946, 950, 952.)  The prosecutor repeatedly argued "'it doesn't matter'" whether, under CALCRIM No. 3471, the victim escalated a nondeadly conflict to deadly proportions.  (*Ramirez*, *supra*, at pp. 943, 946, 950, 952.)  And when defense counsel argued in closing that the defendant regained a right to defend himself if he truly believed the gang rival had suddenly escalated the fistfight to a gunfight, the prosecutor responded by invoking CALCRIM No. 3472 and arguing, "'(Y)ou cannot have the princip(le) to mitigate from murder to voluntary manslaughter . . . when you are the one who created the circumstances to begin with.  It makes sense.  It's fair.  It's just.  More importantly, it's the law.'"  (*Ramirez*, *supra*, at pp. 946-947.)  The prosecutor argued the categorical terms of CALCRIM No. 3472 trumped the right to self-defense explained in CALCRIM No. 3471.  (*Ramirez*, *supra*, at p. 948.)  The appellate court reiterated the repeated arguments by counsel

numerous times, and the prosecutor's closing argument was a substantial factor in the court's holding of prejudicial error.  (See *id.* at pp. 943, 947, 953.)

*Ramirez*, *supra*, 233 Cal.App.4th 940 is distinguishable from the instant action.  The substantially aggravating factor of the prosecutor repeatedly misleading the jury on the law, that is, telling the jury that it did not matter whether the victim escalated a nondeadly conflict to deadly proportions is not present in the instant action.  Here, the prosecutor did argue that based on CALCRIM No. 3472, Vargas was not defending himself because he chased after Estrada, armed with a knife, with the intent to kill Estrada.  The prosecutor therefore argued that it was Estrada, not Vargas, who acted in self-defense.  He emphasized, "Self-defense does not allow -- does not provide justification for the killer if he intended to kill. . . .  (Vargas) went hunting. He brought a deadly weapon.  He chased after the victim, and the victim fought for his own life."  Accordingly, the prosecutor did not tell the jury that Estrada's conduct did not matter.  Instead, he insisted Vargas could not have actually believed in imminent harm from Estrada.

Considering the evidence proffered at trial, the totality of the jury instructions, and the prosecutor's closing argument, there was no instructional error under CALCRIM No. 3472.  At trial in the instant matter, the jury was not required to conclude if Vargas sought a nondeadly confrontation with Estrada, he forfeited the right to self-defense even if the victim resorted to deadly force.

(ECF No. 7-24 at 20-24.)

In evaluating a claim of instructional error, the question is "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'"  Estelle v. McGuire, 502 U.S. 62, 72 (1991), quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973).  "It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record."  McGuire, 502 U.S. at 72, quoting Cupp, 414 U.S. at 147.  As noted earlier, even if federal constitutional error occurred, habeas relief is only available if the error had a "substantial and injurious effect or influence in determining the jury's verdict."  Brecht, 507 U.S. at 637.

///

Petitioner alleges the trial court erred in instructing the jury with CALCRIM No. 3472 "under the facts of this case," and asserts this instruction "effectively prevented the jury from considering his self-defense claim, in that it instructed the jury that a person does not have a right to self-defense if he provokes a fight or quarrel with the intent to create an excuse to use force, regardless of the force employed by the opposing combatant." (ECF No. 1 at 8, ECF No. 7-25 at 29-30.)  In CALCRIM No. 3472, the trial court instructed jurors that the right to self-defense may not be contrived, as follows: "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force."  (CT 438.)  While acknowledging that the CALCRIM No. 3472 instruction when "read alone seems to foreclose a claim of self-defense whenever a defendant provokes a fight," the state court also observed that a reviewing court "must examine the instructions as a whole and presume the jury correlated the instructions," and found "the court here correctly instructed the jury on when self-defense is still available to a defendant who is the initial aggressor."  (ECF No. 7-24 at 21.)

Upon review, this assessment was reasonable.  First, clearly established law directs that the import of CALCRIM No. 3472 cannot be determined "in artificial isolation," but instead the instruction "must be considered in the context of the instructions as a whole and the trial record."  McGuire, 502 U.S. at 72, quoting Cupp, 414 U.S. at 147.  Indeed, Petitioner's jury was similarly directed pursuant to CALCRIM No. 200 that the jury instructions must be considered together and that no one instruction, even if repeated, was more important than any other, as follows: "Pay careful attention to all of these instructions and consider them together.  If I repeat any instruction or idea, do not conclude that it is more important than any other instruction or idea just because I repeated it."  (CT 378.)  In the same instruction, the trial court also directed the jury: "You must decide what the facts are.  It is all up to you, and you alone to decide what happened, based only on the evidence that has been presented to you in this trial," as well as that it was the jury's responsibility to determine, based on their factual findings, whether and which instructions would apply, as follows: "Some of these instructions may not apply, depending on your findings about

the facts of the case.  Do not assume just because I give a particular instruction that I am suggesting anything about the facts.  After you have decided what the facts are, follow the instructions that do apply to the facts as you find them."  (CT 378-79.)

Importantly, Petitioner's jury was also instructed pursuant to CALCRIM No. 3471, which specifically provides a right of self-defense to an initial aggressor or in the event of mutual combat under specified circumstances, in relevant part as follows: "[I]f the defendant used only nondeadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting, or communicate the desire to stop to the opponent, or give the opponent a chance to stop fighting."  (CT 436.)  While CALCRIM No. 3472, when read alone, appears to preclude self-defense where a defendant provoked a fight in order to create a reason to use force, when read in concert with the other jury instructions, particularly CALCRIM No. 3471, it is clear that even an individual who started a fight may have a right to self-defense, such as where the opponent responded with such force that withdrawal was not possible.  Here, the presence of the CALCRIM No. 3471 instruction clearly undercuts Petitioner's assertion that "[t]he instructions and the prosecutor's argument established as a matter of law that petitioner was not entitled to the affirmative defense of imperfect self-defense if he had contrived to use 'any' force, however nondeadly."  (ECF No. 7-25 at 33.)

A fair reading of the prosecutor's closing arguments to the jury does not reflect that the prosecutor erroneously stated the law to assert Petitioner was not entitled to use any force or was not entitled to self-defense under any circumstances.  Upon initial review, the prosecutor contended Petitioner was not entitled to self-defense and asserted he was the initial aggressor.  (RT 4126) ("Think it through.  Look at the instructions.  Understand what [Petitioner's defense counsel] is trying to have you believe and what Mr. Vargas needs you to believe, that he is the victim.  And you will see that doesn't work.  Common sense doesn't support that.  You don't get to be the initial aggressor. . .").  However, the main thrust of the prosecutor's argument was that the evidence introduced at trial showed "Raul

Vargas intended to kill" and "José Estrada had the right to self-defense when two men were coming after him with all of the circumstances and all of the background that you know exist in this case.  He is the victim in this circumstance, on this morning, in this encounter; not Raul Vargas."  (Id.); (see also RT 4057) ("This case is about that chase.  And as I go through the law and I go through the evidence that was presented in this trial, I'm confident that you will see that this case is about the chase.  The chase should convince you that this was nothing more than a cold, calculated, premeditated murder.  This was not self-defense."); (RT 4080) ("Self-defense does not allow - - does not provide justification for the killer if he intended to kill.  Remember, the motivation has to be - - the motivation to kill had to only have been because he was so afraid and he had no other recourse but to act in self-defense.  If he went there with the intent to kill, which the evidence has shown, no justification. He went hunting. He brought the deadly weapon. He chased after the victim, and the victim fought for his own life.").

Nor does a review of the defense argument reflect that self-defense was somehow precluded under the instructions and the facts of the case, as the defense vigorously argued that Petitioner was entitled to use force to defend himself when the victim attacked him with a shovel after the chase.  (See e.g. RT 4097) ("This case is not about the chase.  This case is about the shovel.  Because, Ladies and Gentlemen, when you are faced in that situation with a shovel coming at your head repeatedly, you have the right to defend yourself.  Common sense supports it and the law supports. [¶] This case is about the shovel."); (see also RT 4100) ("When Raul Vargas comes over that fence, there is no weapon in his hand.  There is no threats that have been communicated.  He had not even touched Mr. Estrada.  And at that point in time, Mr. Estrada violently attacks him with a metal shovel.  That is a reasonable belief of death or great bodily injury.")

At any rate, even were Petitioner able to show the prosecutor's arguments contained an incorrect statement of the law, as noted above, the jurors were also advised that the arguments of and other remarks by counsel were not evidence and that in the event of any conflict with comments by counsel, jurors must follow the court's instructions.  (See

33

CT 383) ("Nothing that the attorneys say is evidence.  In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence."); (see also CT 378) ("You must follow the law as I explain it to you, even if you disagree with it.  If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions.").  The trial court also advised jurors that depending on their factual findings and conclusions, not all instructions might apply to the case and that it was the jurors' responsibility to decide what the facts were.  (See CT 378-79) ("You must decide what the facts are.  It is up to all of you, and you alone to decide what happened, based only on the evidence that has been presented to you in this trial. . . Some of these instructions may not apply, depending on your findings about the facts of the case.  Do not assume just because I give a particular instruction that I am suggesting anything about the facts.  After you have decided what the facts are, follow the instructions that do apply to the facts as you find them.").  A jury is presumed to understand and follow the trial court's instructions.  See Weeks v. Angelone, 528 U.S. 225, 234 (2000); Richardson v. Marsh, 481 U.S. 200, 211 (1989).

Based on a review of the trial record and the jury instructions considered as a whole, the Court cannot conclude CALCRIM No. 3472 "'by itself so infected the entire trial that the resulting conviction violates due process.'"  McGuire, 502 U.S. at 72, quoting Cupp, 414 U.S. at 147.  Petitioner not only fails to show that the trial court erred in instructing the jury with CALCRIM No. 3472, he also fails to demonstrate that any alleged error had a "substantial and injurious effect or influence in determining the jury's verdict."  Brecht, 507 U.S. at 637.  Because Petitioner has not shown the state court rejection of this claim was either contrary to, or an unreasonable application of, clearly established federal law, or that it was based on an unreasonable determination of the facts, habeas relief is not available on Claim Three.

### 3.   Claim Four- Use of Juvenile Adjudications as Strike Convictions

In Claim Four, Petitioner contends that the use of his juvenile adjudications as strikes violated his federal constitutional rights to due process, jury trial, equal protection and to

protection against cruel and unusual punishment.  (ECF No. 1 at 9; see also ECF No. 7-25 at 35-41.)  Respondent maintains the state court's denial of this claim was reasonable and federal habeas relief is not available, citing a lack of Supreme Court precedent prohibiting the use of juvenile court findings as strikes and asserting recent Supreme Court cases concerning juvenile offenders upon which Petitioner relies, including but not limited to Roper v. Simmons, 543 U.S. 551 (2005) and Graham v. Florida, 560 U.S. 48 (2010), are inapplicable to the instant situation.  (ECF No. 6-1 at 21-23.)

Because the California Supreme Court's denial was without explanation or a statement of reasoning (see ECF No. 7-26), the Court will again "look through" the California Supreme Court's summary denial to the reasoned opinion issued by the state appellate court with respect to Claim Four.  See Ylst, 501 U.S. at 804.  The California Court of Appeals rejected this claim, reasoning as follows:

> Citing the Ninth Circuit Court of Appeal's decision in *United States v. Tighe* (9th Cir. 2001) 266 F.3d 1187 and the United States Supreme Court's decision in *Apprendi v. New Jersey* (2000) 530 U.S. 466, Vargas contends that the use of two juvenile adjudications as prior strike convictions violated the Sixth, Eighth, and Fourteenth amendments because "a proper interpretation of United States Supreme Court precedent bars using juvenile adjudications to enhance a substantive offense sentence."
>
> However, as Vargas acknowledges, a similar argument was rejected in *People v. Nguyen* (2009) 46 Cal.4th 1007 at page 1028.  Vargas implies *Nguyen* was wrongly decided and that it cannot be reconciled with *In re W.B.* (2012) 55 Cal.4th 30.  But *W.B.* did not address using juvenile adjudications as prior strikes.  Nor did that case discuss or even mention *Nguyen*.  *Nguyen* thus remains precedent.  We are bound to follow it (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455), but note Vargas's preservation of the issue for further review.

(ECF No. 7-24 at 32-33.)

In a separate proceeding from Petitioner's jury trial, the trial court made a true finding on the strike priors pursuant to Cal. Penal Code §§ 667(b)-(i), 1170.12, and 668.  (CT 675.)  On October 2, 2017, Petitioner was sentenced to 46 years to life; the record reflects that as a result of the strike findings, Petitioner's sentence on count one was

"tripled."  (CT 696-97); (see also RT 5228) ("He is sentenced to a term of 15 years to life on Count 1, which is tripled, because of the strike, to 45 years to life.  There is an additional one year for the weapon allegation. . .").  Petitioner contends that the use of these juvenile adjudications to enhance his sentence violated his federal rights.

In Apprendi v. New Jersey, 530 U.S. 466 (2000), the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 490.  The Ninth Circuit subsequently held the use of a non-jury juvenile adjudication to increase a criminal penalty beyond the statutory maximum violated Apprendi, reasoning: "Apprendi's narrow 'prior conviction' exception is limited to prior convictions resulting from proceedings that afforded the procedural necessities of a jury trial and proof beyond a reasonable doubt.  Thus, the 'prior conviction' exception does not include nonjury juvenile adjudications." United States v. Tighe, 266 F.3d 1187, 1194-95 (9th Cir. 2001) (footnote omitted).

Yet, the instant case is also subject to AEDPA review, which bars habeas relief unless the state court adjudication either "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Richter, 562 U.S. at 97-98, quoting 28 U.S.C. § 2254(d)(1)-(2).  Here, the Court finds no support for a conclusion that the state court decision involved an unreasonable factual determination under section 2254(d)(2), and Petitioner does not so argue.  The Court is therefore left to decide whether the state court decision was either contrary to, or an unreasonable application of, clearly established federal law.  Upon review, it is apparent the Ninth Circuit has rejected any such conclusion based on Tighe, as that court has held as follows:

> We have already determined that our holding in *Tighe* is not clearly established Federal law for AEDPA purposes. *See Boyd v. Newland*, 467 F.3d

1139, 1152 (9th Cir.2006). *Boyd* noted that *Tighe* had been rejected not only by the California courts, but also by the Third, Eighth, and Eleventh Circuits. *See id.* We concluded that, "in the face of authority that is directly contrary to *Tighe*, and in the absence of explicit direction from the Supreme Court, we cannot hold that the California courts' use of Petitioner's juvenile adjudication as a sentencing enhancement was contrary to, or involved an unreasonable application of," clearly established Supreme Court precedent. *Id.*

John-Charles v. California, 646 F.3d 1243, 1252-53 (9th Cir. 2011).

Petitioner nonetheless contends that the use of juvenile offenses as strikes is inconsistent with recent United States Supreme Court decisions concerning juvenile offenders, citing Roper v. Simmons, 543 U.S. 551 (2005) and Graham v. Florida, 560 U.S. 48 (2010). (See e.g. ECF No. 7-25 at 36-38.) Petitioner's reliance on those cases is misplaced, as neither decision concerns the propriety of using strike convictions suffered as a juvenile to enhance a sentence. While both decisions concerned juvenile offenses, the Roper Court held only: "The Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed." Roper, 543 U.S. at 578. Meanwhile, the Graham Court extended Roper to hold: "The Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide." Graham, 560 U.S. at 82. Aside from the fact that Petitioner faces neither a death sentence nor a sentence of life in prison without the possibility of parole, Roper and Graham are additionally inapt because Petitioner's sentence, while *enhanced* by prior juvenile convictions, was *imposed* for a murder conviction sustained due to criminal behavior committed when he was clearly an adult. The fact remains that there is a lack of any clearly established federal law prohibiting the use of convictions sustained as a juvenile as strike offenses, and Petitioner does not demonstrate otherwise.

In view of the lack of any United States Supreme Court authority on this point, much less any Supreme Court authority supporting Petitioner's claim of federal constitutional error, the Court is unable to conclude that the state court decision was either contrary to or an unreasonable application of, clearly established federal law. See John-Charles, 646 F.3d

at 1252-53; <u>see also</u> <u>Wright v. Van Patten</u>, 552 U.S. 120, 126 (2008) ("Because [the Supreme Court's] cases give no clear answer to the question presented, let alone one in [Petitioner's] favor, "it cannot be said that the state court 'unreasonabl(y) appli(ed) clearly established Federal law.'"), quoting <u>Carey v. Musladin</u>, 549 U.S. 70, 77 (2006) and 28 U.S.C. § 2254(d)(1).  Accordingly, habeas relief is not available on Claim Four.

**C.     Certificate of Appealability**

"A certificate of appealability should issue if 'reasonable jurists could debate whether' (1) the district court's assessment of the claim was debatable or wrong; or (2) the issue presented is 'adequate to deserve encouragement to proceed further.'" <u>Shoemaker v. Taylor</u>, 730 F.3d 778, 790 (9th Cir. 2013), quoting <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).  Because none of Petitioner's claims meet this standard, a certificate of appealability is not warranted.

## IV.   CONCLUSION

For the reasons stated above, the Petition for a Writ of Habeas Corpus is **DENIED**. The Court **DENIES** a Certificate of Appealability.

**IT IS SO ORDERED.**

Dated: October 16, 2020

_____

Hon. Larry Alan Burns
Chief United States District Judge